**BRAVERMAN KASKEY GARBER PC**
BENJAMIN A. GARBER, ESQ. (# 306765)
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, PA 19103
215.575.3800 (Telephone)
215.575.3801 (Facsimile)    *Attorneys for defendant/counterclaim plaintiff*

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES CORP., MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2017-K724,** *Plaintiff*, | **CIVIL ACTION** **Case 2:24-cv-02051** |
| **v.** | |
| **MM-FCDC PARTNER, L.P.,** *Defendant.* | |

**DEFENDANT'S BRIEF IN OPPOSITION
TO MOTION TO APPOINT RECEIVER**

Defendant MM-FCDC Partners, L.P. ("Borrower"), through its undersigned

counsel, hereby files this Brief in Opposition to the Motion to Appoint Receiver

(ECF # 7) (the "Motion") filed by plaintiff Wells Fargo Bank, National

Association, as Trustee, for the benefit of registered holders of J.P. Morgan Chase

Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-K724 ("Lender").

## PRELIMINARY STATEMENT

Lender's Motion, seeking the drastic and sparingly used remedy of an operating receiver, with vast powers, to control, manage and operate the property, is without any basis in fact or law. ***Appointing a receiver will derail Borrower's impending refinance of the loan at issue and will prevent it from retaining its ownership of the property.*** This cannot be permitted, especially where there has been no "Event of Default" based upon an alleged maturity default which is the only purported basis for the Motion. Borrower denies that the Loan has matured, and that it has failed to repay the Loan upon maturity. To the contrary, Lender is in breach of the parties' maturity extension agreement and the Loan Documents, as alleged in Borrower's Counterclaim, which allegations of wrongdoing Borrower hereby incorporates by reference herein as if restated herein in full. Because there has been no "Event of Default", and because Lender is the breaching party, Lender has no right to seek or obtain the appointment of an all-powerful, operating receiver. Additionally, Lender's unlawful conduct precludes it from obtaining equitable relief. At a minimum, at this early stage of the proceeding, and with the alleged default being disputed, and no discovery being taken, the Motion must be denied as premature.

Furthermore, far from adducing any factual evidence in support of its Motion, the Motion is predicated upon speculative, baseless, boilerplate allegations that are hopelessly lacking in specificity, inaccurate and categorically rejected by Borrower. There is no supporting evidence of any kind submitted with the Motion. Instead, as stated, the Motion is a "one trick pony". Lender simply asserts that its mortgage mandates the appointment of a receiver because an "Event of Default" has occurred. Yet, no "Event of Default" has occurred as alleged. Accordingly, the predicate "Event of Default" required under the mortgage for the Lender to even apply for a receiver has not been satisfied.

Lender also fails to demonstrate the existence of any "imminent threat" of injury or loss to or dissipation of the property. In fact, the evidence demonstrates otherwise. Borrower is heavily invested in the Property (and the Brewerytown neighborhood generally) and ***is in the process of refinancing*** the loan at issue, with a new lender with whom it has a successful longstanding relationship, so that Borrower can retain its ownership of the Property. Imposition of a receiver will derail the refinance and cause substantial prejudice to Borrower without basis. Even if everything that Lender avers is true (and it is not), Borrower expects that the refinance will be consummated in the short-term making the notion of a receiver nonsensical, and consideration of the issue a waste of time and money for all involved.

In yet another deficiency, Lender does not, because it cannot, present any legal authority in support of its Motion. Lender generally cites two cases, without any specificity or explanation, and none of which demonstrate any right to the appointment of a receiver under the circumstances present here.

Against the foregoing, and for the reasons set forth more fully herein, the Motion should be denied.

## FACTS

### The Property

The property at issue in this action is The Braverman Building (the "Property") located in Brewerytown at 2617-2619 W Girard Ave, Philadelphia, PA 19130.[1] *See* Affidavit of David Waxman on behalf of Borrower, attached hereto as Exhibit "1", at ¶ 5. The Property, completed in 2015 by Borrower, is a five-story mixed-use multi-family building with two commercial suites and 16 residential units. *Id.* at ¶ 6. MM Partners, LLC is the manager of the Property. *Id.* at ¶ 7. Mr. Waxman has been the lead developer in the Brewerytown neighborhood of Philadelphia since 2002 and indirectly owns hundreds of units within blocks of the Property which MM Partners, LLC manages successfully. *Id.* at ¶ 8. He is heavily invested in the neighborhood. *Id.*

---

[1] There is no nexus between the name of the building and the name of Borrower's attorney's firm, Braverman Kaskey Garber PC. It is a coincidence.

### The Loan

On October 7, 2016, Berkadia Commercial Mortgage made a commercial mortgage loan to Borrower in the original principal amount of $3,601,000 (the "Loan"). *Id.* at ¶ 9. The Loan is evidenced by a Multifamily Note and Multifamily Loan and Security Agreement (the "Loan Agreement") and secured by a Multifamily Mortgage, Assignment of Rents and Security Agreement (the "Mortgage"), among other documents executed in connection with the Loan (collectively, the "Loan Documents"). *Id.* at ¶ 10.

Well Fargo Bank is the trustee of the CMBS mortgage trust at issue. *Id.* at ¶ 11. Midland Loan Services, a division of PNC Bank, National Association ("Midland") is believed to be the "Special Servicer" of the trust. It may also be the "Master Servicer" of the trust. *Id.* at ¶ 12. Berkadia Commercial Mortgage LLC ("Berkadia") is believed to be the "Master Servicer" or one of the sub-servicers of the trust. *Id.* at ¶ 13.

### The Extension

In September 2023, Borrower sought an extension of the Loan's maturity date. *Id.* at ¶ 14. Borrower requested a 120-day extension of the maturity date for the purpose of refinancing the Loan with a new lender. *Id.* at ¶ 15. Midland was amenable to the requested extension and in furtherance thereof its representatives

physically toured the Property on January 16, 2024.  *Id.* at ¶ 16.  Midland also

requested and received various financial information concerning the Property,

including operating statements and a rent roll.  *Id.* at ¶ 17.

Having toured the Property and received the Property financials, Midland

asked when the refinance would occur.  *Id.* at ¶ 18.  On February 20, 2024,

Borrower's representative advised Midland that the refinance was scheduled to

occur within nine (9) weeks from the execution of a term sheet with the new

lender.  *Id.* at ¶ 19.  On March 6, 2024, Borrower delivered to Midland an executed

term sheet, meaning that the refinance was expected to occur on or about May 8,

2024.  *Id.* at ¶ 20.  Borrower believed at this time that it had been granted the

requested extension.  *Id.* at ¶ 21.

### Lender's $100,000 Fee Demand

Weeks later, in late March 2024, Borrower was surprised to receive

correspondence from Midland advising that it would be filing a foreclosure action

against the Property and complaining that it had not received any good faith

payments toward the Loan since October 2023.  *Id.* at ¶ 22.  Borrower was amazed

by the statements given that it believed that the extension had been granted and

that funds sufficient to make any good faith payments were available to Lender.

*Id.* at ¶ 23.

***Borrower immediately responded to Midland, writing "can you send us
wiring instructions?  All our payments have been sitting in our entity's bank
account and Berkadia will not remit payment from us.  Please provide the detail
and we will get this paid ASAP."*** *Id.* at ¶ 24.  Midland did not provide its wiring
instructions and did not respond to Borrower's statement that Berkadia would not
remit any payments on behalf of the Borrower.  *Id.* at ¶ 25.

On April 4, 2024, Borrower had a telephone call with Midland's
representatives.  *Id.* at ¶ 26.  During the call, Midland demanded payment of a
$100,000 "fee" in connection with the forthcoming refinance.  *Id.* at ¶ 27.  The
Loan Documents do not require the payment of a $100,000 fee in connection with
any refinance.  *Id.* at ¶ 28.  Borrower requested an explanation for the basis of such
a fee, believing that no such fee was due and owing.  *Id.* at ¶ 29.  Midland refused
to answer or explain its request but continued to demand said payment from
Borrower.  *Id.* at ¶ 30.  By letter dated April 15, 2024, Borrower, through counsel,
demanded to know the basis for Midland's demand for payment of $100,000 in
connection with the refinance.  *Id.* at ¶ 31.  In the letter, Borrower again advised
Midland that there was cash available to Lender which Berkadia would not accept.
*Id.* at ¶ 32.

On April 19, 2024, Borrower received correspondence (a so-called "no deal"
letter) from Lender's counsel which denied that there was any agreement to extend

the Loan's maturity date and rejected any and all agreements that ever existed concerning the extension. *Id.* at ¶ 33. That same day, Borrower also received an email from Lender's counsel stating that for purposes of the extension Midland had not been requesting a $100,000 fee, which was inaccurate, but instead had been requesting "the equivalent of monthly principal and interest payments from November 1, 2023, plus default interest and other fees which all totaled $169,321.00." *Id.* at ¶ 34. Lender's counsel also stated that "Borrower is free to make any payment at any time to the master servicer as Borrower did in the past" which was also inaccurate. *Id.* at ¶ 35.

Borrower had available to Lender approximately $169,000, the amount that Lender's counsel later advised Borrower it had to remit for the extension, monies which Berkadia and Midland refused to accept. *Id.* at ¶ 36.

### Lender's Wrongdoing

Lender agreed to extend the maturity date of the Loan. *See* Borrower's Answer, Affirmative Defenses and Counterclaim, attached hereto as Exhibit "2", at ¶ 35. Lender led Borrower to believe that the maturity date of the Loan had been extended through its words and actions. *Id.* at ¶ 36. Lender refused to comply with the agreed upon maturity date extension on the grounds that Borrower did not pay a $100,000 fee that was never due and owing. *Id.* at ¶ 37. Lender did not and

never has justified its fee demand and instead pretended as if it never happened. *Id.* at ¶ 38.

Lender refused to justify the demand (because it could not do so) and then disclaimed the existence of the maturity date extension agreement and advised Borrower that the payment it sought was not a fee but a request for payment of the accrued monthly debt service payments which Borrower could have delivered had Lender been willing to accept the payments. *Id.* at ¶ 39. The only reason that the payments had accrued was because Berkadia and/or Midland refused to accept the payments from Borrower. *Id.* at ¶ 40.

Borrower did everything that was reasonably asked of it in connection with the maturity date extension agreement, but Lender and its servicers engaged in misleading conduct. *Id.* at ¶ 41. The maturity date extension agreement was repudiated on account of Borrower allegedly "failing" to pay Lender monies that Borrower never owed or monies that it sought to pay but Lender would not accept. *Id.* at ¶ 42.

Lender and its servicers refused and/or prevented Borrower from making the payments, depriving Borrower of the benefits of the maturity extension agreement and causing it harm. *Id.* at ¶ 43. Midland refused to provide its wiring instructions and Berkadia would not accept payments from Borrower advising Borrower that all loan payments had to go through Midland which was simultaneously or in

concert with Berkadia frustrating Borrower's ability to perform. *Id.* at ¶ 44. While refusing to provide its wiring instructions and accept payment, Midland advised Borrower that payments *could* be made through Berkadia which was the opposite of what Berkadia was advising Borrower. *Id.* at ¶ 45.

By and through their actions, Lender and its servicers acting on its behalf prevented Borrower from consummating the maturity date extension agreement. *Id.* at ¶ 46. By and through their actions, Lender and its servicers sought to create the scenario where they could deprive Borrower of the maturity date extension in order to generate fees which were not due and owing, such as the $100,000 fee that was demanded and the alleged "Liquidation Fee" that is alleged to be "compensation" to Midland. *Id.* at ¶ 47.

Lender's acts and omissions, including its erroneous demand for a $100,000 fee that was neither due or owing and its refusal to accept payment from Borrower, was wrongful and deprived Borrower of the benefits of the maturity date extension agreement and caused it to suffer losses which continue to accrue. *Id.* at ¶ 48.

Had Lender and its servicers acted diligently and properly, the maturity date of the Loan would have been extended through July 30, 2024, at a minimum. *Id.* at ¶ 49. Until such time that Lender cures its ongoing breaches, the maturity date cannot expire. *Id.* at ¶ 50. Lender's foreclosure action, and request for a receiver, is erroneously predicated upon an alleged maturity default which was caused by

Lender and its servicers' wrongful acts and omissions and failures to properly administer the Loan. *Id.* at ¶ 51.

Lender has charged Borrower and claimed as due and owing from Borrower default interest, despite there being no "Event of Default" as claimed, and other unauthorized fees, costs, expenses, and other charges based upon Lender's erroneous declaration of default. *Id.* at ¶ 52. This includes but is not limited to Lender's imposition of a "Liquidation Fee" in the amount of $34,403.51 the imposition of which is not supported by any of the Loan Documents and which fee Borrower never agreed to pay. *Id.* at ¶ 53. Upon information and belief, Lenders and its servicers failed to follow the applicable guidelines, limitations, policies and procedures set forth in its servicing agreements in its dealings with the Borrower. *Id.* at ¶ 54.

Lender has improperly commenced this foreclosure action against Borrower, and sought a receiver, predicated upon Borrower's failure to pay amounts, and failure to fulfil obligations, that had been discharged, excused and/or suspended. *Id.* at ¶ 55. As a result of Lender's breaches and unlawful conduct, Borrower has incurred, and will continue to incur, financial losses including unnecessary fees, costs, and expenses. *Id.* at ¶ 56.

## The Impending Refinance;
## <u>Borrower Properly Manages the Property and there is No Threat of Waste</u>

Borrower has advised Lender that the refinance is imminent and has given updates to the Lender concerning the same.  *See* Waxman Affidavit, at ¶ 65. Borrower has a longstanding, successful relationship with the new lender that goes back to 2003.  *Id.* at ¶ 66.  Nevertheless, the current financing environment, as is well known, is the most challenging it has been since the financial crisis of 2008, so the financing process moves more slowly.  *Id.* at ¶ 67.  However, nearly all conditions precedent to closing the refinance have been satisfied.  *Id.* at ¶ 68. Borrower is awaiting certain certifications from the City of Philadelphia.  *Id.*  The appointment of a receiver would decrease the value of the Property ***and derail Borrower's refinance*** thereby depriving Borrower of the ability to satisfy the Loan and retain ownership of the Property.  *Id.* at ¶ 63.

Upsetting the proverbial apple cart by imposing an operating receiver would be counter-productive, harm the Property and its residents, and be unduly costly and without basis given there is no default and Lender is the breaching party.  *Id.* at ¶ 46.  The fees that the operating receiver intends to charge are excessive.  *Id.* at ¶ 47.

MM Partners, LLC is the manager of the Property. *Id.* at ¶ 44.  MM Partners, LLC is uniquely qualified to continue serving its management role at the Property. *Id.* at ¶ 45.

Borrower has no interest in devaluing the Property, only improving it. *Id.* at ¶ 48. There is no danger or threat of dissipation of the Property. *Id.* at ¶ 49. Borrower has properly maintained the Property. *Id.* at ¶ 50. The Property does not currently require any unaddressed repairs. *Id.* at ¶ 51. There is no danger of imminent waste or loss of the Property. *Id.* at ¶ 52.

To the contrary, Borrower has made significant improvements to the Property and intends to continue to do so. *Id.* at ¶ 53. As part of the forthcoming refinance, Borrower will invest $300,000 of capital into the Property to improve certain units and common areas. *Id.* at ¶ 54. Borrower and its team at MM Partners, LLC are adept at managing the Property and have done so successfully for years. *Id.* at ¶ 55. Borrower and MM Partners, LLC are unaware of any tenant complaints, and the tenants' needs are successfully met. *Id.* at ¶ 56. On an ongoing basis, Borrower preserves, protects, and maintains the Property at a reasonable and appropriate standard. *Id.* at ¶ 57. The Property is one of the most well-maintained properties in the city. *Id.* at ¶ 59.

The Property is worth more than the alleged debt claimed by Lender. *Id.* at ¶ 60.

The rents have not been improperly commingled, retained or diverted. *Id.* at ¶ 61. The appointment of an operating receiver would be wasteful and unfounded and would disrupt the ongoing operations at the Property with which Borrower and

its team are intimately familiar. *Id.* at ¶ 62. Since the filing of this action, Borrower has continued to provide financial information concerning the Property and to cooperate with Lender. *Id.* at ¶ 64.

The taxes on the Property are paid in full; there is no delinquency. *Id.* at ¶ 69. The insurance on the Property is paid, and the Property is fully and adequately insured. *Id.* at ¶ 70. The insurance on the Property renews on June 30, 2024, and the Borrower will renew the coverage so that there is no lapse in coverage. *Id.* at ¶ 71.

## ARGUMENT

### A. STANDARD

The Loan Documents are governed by the laws of the Commonwealth of Pennsylvania.[2] State courts in Pennsylvania hold the strong view that the appointment of a receiver is an extreme action. The Pennsylvania Supreme Court explained nearly one hundred years ago why Pennsylvania courts take such a firm line regarding appointment of receivers:

> There is nothing, however, which affects a corporation with such serious consequences as does the appointment of a receiver; it is a severe, and may be termed an heroic remedy, and the conditions that call it into action should be such as would, if persisted in, ordinarily be fatal to corporate life. The appointment is a distress signal, and is immediately followed by lowering of financial credit and a general readjustment. It follows, because of the intense responsibility attached to the office, courts will not appoint receivers where there is

---

[2] Loan Agreement, at § 11.02 (attached as Exhibit "A" to the Complaint).

well founded suspicion it would be followed by serious injustice or injury to the rights of all parties interested.  The court, before any appointment is made, will act with the utmost caution.

*McDougall v. Huntingdon & Broad Top R. & C. Co.*, 143 A. 574, 577-78 (Pa. 1928).

"In view of the serious consequences following the appointment of a receiver, a court must be absolutely certain that it is necessary to protect the interests of creditors." *Northampton Nat'l Bank v. Piscanio*, 475 Pa. 57, 63 (1977). Especially for a solvent corporation, the appointment of a receiver can cause stigma to the ongoing business. *See Hankin v. Hankin*, 507 Pa. 603, 612-13, 493 A.2d 675, 679 (1985).

A receiver is not imposed solely because one party has a claim against another; rather, appointment of a receiver is a "harsh remedy" that is "typically imposed only as a last resort." *Liss v. Liss*, Nos. 2063, 062237, 2003 Phila. Ct. Com. Pl. LEXIS 48, at *1 (C.P. Jan. 29, 2003).

Pennsylvania courts warn that the power to appoint a receiver "should be exercised sparingly, with caution and circumspection, and only in an extreme case under extraordinary circumstances, or under such circumstances as demand or require summary relief." *Tate v. Phila. Transp. Co.*, 190 A.2d 316, 317 (Pa. 1963).

Because the appointment of a receiver "unquestionably interferes" with the right to control property, a receiver should only be appointed "in cases of

necessity, and when the plaintiff clearly and satisfactorily shows that an emergency exists and the receiver is needed to protect the property interests of the plaintiff." *MSCI 2006-IQ11 Logan Boulevard Ltd. P'ship v. Greater Lewistown Shopping Plaza, Ltd. P'ship*, No. 4:16-CV-2090, 2017 U.S. Dist. LEXIS 16457, at *13 (M.D. Pa. Feb. 6, 2017).

Receivers are not to be appointed when there is another expedient, adequate, or less drastic remedy at law. *See Northampton Nat'l Bank v. Piscanio*, 475 Pa. 57, 59, 379 A.2d 870, 871 (1977).

## B. <u>THERE HAS BEEN NO EVENT OF DEFAULT</u>

The Court should outright deny the Motion because the claimed "Event of Default" underlying the Motion is specious or, at a minimum, disputed by Borrower. There has been no "Event of Default" as claimed. To the contrary, Lender is in breach of the parties' maturity extension agreement and the Loan Documents, as alleged in Borrower's Counterclaim, which allegations of wrongdoing Borrower hereby incorporates by reference herein as if restated herein in full.

Therefore, this Court should not appoint an operating receiver with vast powers based upon a non-existent or disputed event of default, especially at the preliminary stage of the case and before discovery has been completed.

The case of *Wells Fargo Bank, N.A. v. Premier Hotels Group, LLC*, 2015

U.S. Dist. LEXIS 10483, *21, 2015 WL 404549 (ED Pa. 2015) is instructive.

There, plaintiff sought the appointment of a receiver.  Like here, borrower disputed

the claimed default.  The bank moved for summary judgment.  The Court, applying

Pennsylvania law, denied summary judgment reasoning that:

> The Court's finding that genuine issues of material fact exist
> regarding Premier's alleged default affects the Court's analysis of
> Wells Fargo's motion to appoint a receiver.  Trustee's motion mainly
> relies on the provision of the Mortgage which permits the appointment
> of a receiver as a remedy for default. (Doc. 7-3 at 7-10).  Although
> this clause would militate in Trustee's favor if there was an
> undisputed default, Wells Fargo's reliance on this language is
> misplaced for at least two reasons.  First, Trustee's contractual right to
> appoint a receiver is triggered by an event of a default, and, as stated,
> it is disputed whether Premier defaulted.

*Id.* at *21-22.

> The Court went on to reason that:

> **If, after trial**, Wells Fargo were to prove that Premier defaulted
> on the Mortgage, then the appointment of a receiver **may** be
> appropriate.  However, it would be premature for the Court to grant
> Trustee's motion at this stage in the litigation.  Moreover, Wells Fargo
> does not offer evidence indicating that Premier's financial status is so
> precarious as to endanger its interest in the collateral or to leave
> Trustee without an adequate remedy at law.  According to Premier,
> the Hotel has not been scheduled for tax sale and value of the property
> is greater than the amount it owes under the Note (Matta Decl. at ¶¶ 5-
> 8, 18).

*Id.* at *24-25 (emphasis added).

The "take away" from *Premier Hotels Group* is obvious.  It would be entirely improper and premature at this stage to grant the Motion.  This is especially so here where there is a dispute concerning whether there has been an event of default as alleged (which could give rise to the appointment of a receiver).

Lender's defaults are material, pre-occurring and uncured, thus excusing Borrower's performance, as a matter of law.[3]  *See e.g.*, *Pure Earth, Inc. v. Call*, 2012 U.S. Dist. LEXIS 38178, *1 (ED Pa. 2012) ("In Pennsylvania, a material breach of contract excuses performance by the non-performing party.") (citing *Ott v. Buehler Lumber Co.*, 541 A.2d 1143, 1145 (Pa. Super. 1988)).  Lender's request for a receiver is, therefore, based upon spurious, unfounded allegations that are disputed by Borrower.  Under these circumstances, the Motion cannot be granted.

As in *Premier Hotels Group*, the issue of whether to appoint an operating receiver cannot be ripe for consideration or disposition until ***after trial*** when findings of fact have been made (certainly not at the pleading stage).  Also, like in *Premier Hotels Group*, Lender has not presented evidence showing that Borrower "owes more than the Property is worth" or that "there is an imminent threat of further reduction in the value of the Property."  To the contrary, here, there is no danger or threat of dissipation of the Property, the Borrower intends to retain its

---

[3] Pennsylvania law applies.  *See* Note, at § 9; Loan Agreement, at § 9.3.

ownership of the Property and is in the process of refinancing the Loan, and the

Property is worth more than the alleged debt.  *See* Waxman Affidavit.

Against the foregoing, the Court should deny the Motion.

### C. <u>LENDER'S OTHER ARGUMENTS ARE UNAVAILING</u>

Lender first asserts that the mortgage *requires* this Court to impose an

operating receiver.  Lender's Memorandum of Law, at p 9.  Wrong.  To the

contrary, the mortgage only potentially allows for the appointment of a receiver

***only if*** an Event of Default has occurred and is continuing.  *See* Mortgage, at § 3.

All of the purported remedies set forth in Section 3(c) of the Mortgage are

qualified by the language "If an Event of Default has occurred and is continuing."

Section 3(c)(ii) relating to the appointment of a receiver is specifically limited by

this same qualifier as well, stating:

> Alternatively, ***if an Event of Default has occurred and is continuing***,
> regardless of the adequacy of Lender's security, without regard to
> Borrower's solvency and without the necessity of giving prior notice
> (oral or written) to Borrower, Lender may apply to any court having
> jurisdiction for the appointment of a receiver for the Mortgaged
> Property to take any or all of the actions set forth in the preceding
> sentence.  If Lender elects to seek the appointment of a receiver for
> the Mortgaged Property ***at any time after an Event of Default has
> occurred and is continuing***, Borrower, by its execution of this
> Instrument, expressly consents to the appointment of such receiver,
> including the appointment of a receiver *ex parte* if permitted by
> applicable law.

(emphasis added).

Here, there has been no "Event of Default", and Lender is in breach. Accordingly, while the mortgage may grant Lender the right to *seek* appointment of a receiver under certain circumstances (i.e., where an Event of Default has occurred and is continuing), such circumstances do not exist here. Therefore, Lender's reliance upon the Mortgage as the sole basis for its Motion fails because the alleged condition precedent thereto fails.

The case of *Metropolitan Life Ins. Co. v. Liberty Ctr. Venture*, 650 A.2d 887, 437 Pa. Super. 544 (Pa. Super. 1994) relied upon by Lender is easily distinguishable and unavailing. The decision favors denying the Motion. There, plaintiff's motion to appoint a receiver was ***denied*** because the issue of whether there had been a default was in dispute and had not been decided. *Id.* at 547. It was not until *after discovery* and *after a federal court's decision on summary judgment* disposing of the issue of the alleged default in favor of the lender, and upon the filing of a renewed motion to appoint a receiver, that a receiver was appointed. *Id.* at 548.

Here, the issue of whether an "Event of Default" has occurred has not been decided. The case of *In re Taggart*, 2024 U.S. App. LEXIS 5262, *7 is also unavailing. That case had nothing to do with the appointment of a receiver. The portion of the decision relied upon Lender simply states certain black letter Pennsylvania law concerning the enforcement of an assignment of rents provision

in a mortgage, which must be enforced by sending notice to the tenants. Here, Borrower has not exercised or enforced any assignment of rents provision in the mortgage.

Lender next asserts that "milder measures" will not adequately protect Lender's rights. *See* Lender's Memorandum of Law, at p. 8. However, Lender offers no explanation for this contention other than its statement that it has a contractual right to the appointment of a receiver which right it claims must be protected. This argument fails for the same reasons above. Lender does not even address the issue or whether "milder measures" exist.

Here, they do exist. One would be requiring Borrower to provide monthly reporting to Lender regarding the Property.

Next, Lender asserts that its "contractual legal remedies may be inadequate", going back again to the rents from the Property which Lender speculates may become "impractical" because of future changes in the identity of the tenants. *Id.* at p. 9. This is not a valid basis to appoint an all-powerful operating receiver—this is simply sheer speculation on what may happen in the future. And, notably, there is no evidence of any diversion or misappropriation of any rents and Lender has not even exercised its alleged right to collect the rents from any of the tenants. Also, Lender would have a claim for monetary damages (i.e., an adequate remedy at law) under its hypothetical scenario for which the appointment of a receiver

would be improper anyway. And the Lender is over-secured anyway because the Property is worth more than the alleged debt.

Lender next asserts, as its alleged fourth point, that the rents from the Property may be lost. This is the same assertion as its third. Lender would have a claim for monetary damages (i.e., an adequate remedy at law) under its hypothetical scenario for which the appointment of a receiver would be improper anyway. Also, Borrower is not diverting any rents.

Lender also references Property taxes and insurance. However, the taxes and insurance are or have been paid. The Property is fully insured. There is no tax deficiency. There is no threat to the priority of Lender's mortgage lien. The Property is not scheduled for any tax/judicial sale. Borrower intends to keep the Property and refinance the Loan.

In its last argument, Lender asserts that the balance of harms analysis weighs in its favor. But its argument is again first and foremost focused on the rents from the Property which are being collected and properly accounted for, and in connection with which Lender would have an adequate remedy at law. Lender, of course, adduces no evidence that any rents are being diverted by Borrower. Lender also does not claim to be under-secured.

***Appointing a receiver would be disastrous. First, it would derail Borrower's impending refinance.*** It would cause confusion amongst the tenants

whose units are properly managed by the Borrower's management company.  The appointment of a receiver would also create unnecessary expense for all involved and be an unnecessary drain on judicial recourses.

Lender proposes that Gregg Williams of Trident Pacific Real Estate Group, Inc. serve as the receiver.  Not only would Mr. Williams cost as much as $3,000 per month, but Mr. Williams also appears to be wholly unqualified.  Mr. Williams and his company, based on the West Coast in California, *appear to have no experience managing properties in Philadelphia* (and little to no experience managing properties in Pennsylvania for that matter).  Mr. William's resume claims he has "worked extensively throughout Orange, Riverside, San Bernardino and San Diego Counties" in California—not anywhere in Philadelphia.  Mr. Williams has a California area phone number and the company's website reveals an office address in Houston, Texas.  https://tridentpacificreg.com/contact.

Appointing a receiver would be completely unfounded.  Borrower would be unable to complete the refinance and retain ownership of the Property.   Borrower successfully manages and maintains the Property.  Borrower has done nothing to reduce the value of the Property.  Borrower has no interest in devaluing the Property.  There is no evidence of any mismanagement nor can there be, as Borrower and its team are adept at managing the Property and have done so successfully for years.  They are heavily invested in the neighborhood.  Instead, the

imposition of an operating receiver would derail the refinance and be wasteful and harmful to the Property and its residents by disrupting the ongoing operations at the Property, and the maintenance and management thereof, with which Borrower and its team are intimately familiar.

Since the value of the Property exceeds the debt, there is also no basis to appoint a receiver. *See Northampton Nat'l Bank v. Piscanio*, 475 Pa. 57 (1977).

Under these circumstances, a receiver must not be appointed.

## RELIEF REQUESTED

For all the foregoing reasons, the Court should deny the Motion.

Appointing a receiver is unwarranted and would be a disaster.

The Mortgage does not provide a basis for the appointment of an operating receiver and none of the equities militate in favor of Lender. To the contrary, they auger in favor of denying the drastic relief sought in the form of an operating receiver. Inasmuch as there has been no "Event of Default" as claimed and Lender is the breaching party, Lender is entitled to no equitable relief and the Motion constitutes an abuse of process that should be rejected.

Respectfully submitted,

**BRAVERMAN KASKEY GARBER PC**

Dated: June 19, 2024          BY:  */s/ Benjamin A. Garber*
                                    BENJAMIN A. GARBER, ESQ.
                                    *Attorneys for defendant/counterclaimant*

24