IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO BANK, NAT'L ASS'N AS TRUSTEE FOR THE BENEFIT OF REGISTERED HOLDERS OF J.P. MORGAN CHASE COM. MORTG. SEC. CORP., MULTIFAMILY MORTG. PASS-THROUGH CERTIFICATES, SERIES 2017-K724 : : : : : : : : : | |
| **Plaintiff,** : : | |
| v. : : | Civ. No. 24-2051 |
| MM-FCDC PARTNERS, L.P., : : | |
| **Defendant.** : | |

**Diamond, J.**                                                                                     **July 24, 2025**

## MEMORANDUM OPINION

Plaintiff Wells Fargo Bank, N.A. moves for summary judgment in this commercial foreclosure action against MM-FCDC Partners, L.P. (Doc. No. 61.) Because it is undisputed that MM defaulted on its Wells Fargo mortgage, I will grant the Motion as to liability and all requested damages other than the claimed Liquidation Fee. Wells Fargo also renews its Motion to Appoint Receiver, which I will deny without prejudice. (Doc. No. 26.)

**I.    BACKGROUND**

I have construed the facts and resolved all factual disputes in MM's favor.

On October 7, 2016, Berkadia Commercial Mortgage LLC and MM executed a $3,601,000 loan agreement and promissory note, secured by a mortgage on the "the Braverman Building" in North Philadelphia. (Doc. No. 35 ¶ 1; Doc. No. 61-4 Ex. A; Doc. No. 61-5 Exs. A, B, C.) The Loan was set to mature on November 1, 2023. (Doc. No. 61-5 Ex. B, at 2.) The Loan Agreement also provided that the Loan could be placed into a securitized trust. (Id. Ex. A § 11.03.) Berkadia

1

assigned the Loan to Federal Home Loan Mortgage Corp., which then assigned it on January 24, 2017 to a "REMIC" (Real Estate Mortgage Investment Conduit) trust of which Wells Fargo is the trustee.  (See id. Exs. D, E.)  Under the Loan Agreement, Wells Fargo has "sole and absolute discretion" "in any instance where the consent or approval of Lender may be given or is required." (Id. Ex. A § 11.09.)

Midland Loan Services serviced the Loan on Wells Fargo's behalf.  (Doc. No. 61-4 ¶¶ 1-3.)  Midland contracted with Berkadia to perform routine administration, including payment processing, while the Loan was performing.  (Doc. No. 62-4 at 24:10-25:14; Doc. No. 62-6.)  If MM defaulted, however, the Loan would require special servicing, and all administration would revert to Midland.  (Doc. No. 62-4 at 24:14-26:18.)

In mid-September 2023, MM emailed Berkadia, seeking a 120-day extension of the Loan Maturity Date.  (Doc. Nos. 62-5, 62-15 ¶ 15.)  Mike Aylmer, a Director of Mortgage Banking at Berkadia, emailed MM Partner Joe Zimatore that "[t]ypically, the Master Servicer [Midland] will allow for a short term maturity deferral (typically up to 120 days)."  (Doc. No. 62-5.)  Aylmer confirmed on September 27, 2023 that MM's extension request had been submitted to Midland. (Id.)

On November 1, 2023—the Loan Maturity Date—Berkadia Vice President Anderson Cheng emailed MM Partner Andrew Gordon that, "I'm finalizing your maturity extension request," and attached a formal "requirements" letter.  (Id.)  The letter provided that: (1) the Loan had been sold into securitization; (2) Berkadia was a subservicer of the Loan, not the owner (which was Wells Fargo), and (3) $2500 was necessary to begin underwriting the request.  (Doc. No. 62-6 at 1.)  The letter also included an admonition:

> This letter is in response to an inquiry and shall not be deemed to be our unconditional consent to your request.  By responding to your inquiry, Berkadia does not waive any of the rights and remedies of the Lender under any of the Loan

documents.

(Id. at 3.)

A week later, MM executed the letter and submitted the $2500 fee, after Cheng had emailed Gordon again, noting that the Maturity Date had passed. (Id. at 4; Doc. No. 62-7.) Because the Loan was in default, administration reverted to Midland for special servicing. (Doc. No. 62-8; Doc. No. 62-4 24:10-26:18.) Midland Senior Asset Manager Carla Byers took over responsibility for the Loan. (Doc. No. 62-9.) On December 12, 2023, Byers emailed Berkadia, asking when the reserve funds transferred because "Borrower has sent in a payment." (Doc. No. 62-14.) Berkadia confirmed the reserve funds had transferred on December 11, which would trigger Berkadia sending a "goodbye letter" to MM with new account information for making payments. (Id.)

On December 5, 2023, Midland sent MM a "Pre-Negotiation" letter, stating that it was the Loan's Special Servicer, and that "[y]ou have requested that Midland, on behalf of Lender, engage in discussions with you regarding the above-referenced loan." (Doc. No. 61-5 Ex. F.) The letter specified that either Wells Fargo or MM could "terminate the Discussions at any time and for any reason, without any advance notice," and that no arrangement would be binding without a "definitive written agreement" between the Parties. (Id.) MM executed the letter on December 20, 2023. (Id.) Byers and her manager Brian Davis toured the Property in January 2024, as was customary for a mortgage loan subject to special servicing. (Doc. No. 62-4 at 23:10-14, 26:19-27:6, 30:1-20; Doc. No. 62-15 ¶ 16.)

On January 4, 2024, MM Partner David Waxman emailed Byers, again requesting a 120-day extension "to effectuate a refinancing." (Doc. No. 62-12.) Byers replied that, "Midland is in receipt of the Borrower's letter and is reviewing internally." (Id.) On March 6, 2024, MM delivered an executed term sheet to Midland, with its refinance to occur on or about May 8, 2024. (Doc. No. 62-15 ¶ 20.)

3

On March 25, 2024, Byers emailed Zimatore and Waxman that Midland would initiate an enforcement action because the Loan was past maturity and no good faith payments had been made since October 2023.  (Doc. No. 62-13.)  Waxman replied, "Carla, I'm a bit confused, we are in process of effectuating a refinancing.  The appraisal took place last week and we are moving to close.  We need time to do this."  (Id.)  Zimatore requested wiring instructions, stating, "All our payments have been sitting in our entity's bank account and Berkadia will not remit payment from us."  (Id.)  Byers proposed scheduling a phone call to discuss her email.  (Id.)

During an April 4, 2024 telephone discussion, Midland representatives demanded a "$100,000 fee" in connection with MM's refinance.  (Doc. No. 62-15 ¶ 27.)  The next day, Byers emailed Zimatore and Waxman, stating that: (1) Midland would require a $169,321 payment by April 8, 2024 "to accommodate [MM's proposed] closing date of May 1"; (2) this was a "one time accommodation"; and (3) failure to pay the Loan in its entirety by May 1, 2024 would result in an enforcement action.  (Doc. No. 62-16.)  Byers provided MM with wiring instructions for payment.  (Id.)

On April 16, 2024, Defense Counsel Benjamin Garber mailed Davis a letter demanding that Midland "explain[] the basis for its demand for payment of $100,000."  (Doc. No. 62-17.)  The letter further stated that Berkadia had refused to accept the $69,000 in MM's account and had directed MM to pay Midland.  (Id.)  Three days later, Plaintiff's Counsel Christopher Schueller responded with a "No-Deal" letter, stating that any settlement proposals were now withdrawn, "including the proposal to forbear from commencing foreclosure through May 1, 2024, which proposal [MM] never accepted or performed."  (Doc. No. 62-18.)  On the same day, Schueller emailed Garber explaining that the $169,321 was principal, interest, default interest, and fees due from the November 1, 2023, Maturity Date, as part of a possible "forbearance arrangement" that MM had requested to avoid foreclosure due to its "imminent" refinancing.  (Doc. No. 62-19.)  The

4

forbearance was now moot given the "No-Deal" letter and MM's failure to pay.  (Id.)

## II.    PROCEDURAL HISTORY

Wells Fargo began suit on May 14, 2024, alleging that MM owed $3,451,634.26, including a $34,403.51 "Liquidation Fee," and moving for appointment of a receiver, which I denied.  (Doc. No. 1 ¶ 28.)  Wells Fargo then revoked MM's right to collect and use rent from the Property.  (Doc. No. 26-10 at 2.)  MM counterclaimed for breach of contract, breach of good faith and fair dealing, declaratory judgment, and promissory estoppel, alleging that an agreement existed to extend the Loan's Maturity Date.  (Doc. No. 11 at 9-19.)  Wells Fargo moved to dismiss the Counterclaim, and while that Motion was pending, the Bank also moved for summary judgment on its Complaint.  (Doc. No. 14, 23.)  I dismissed without prejudice MM's Counterclaim on October 16, 2024, and permitted MM to amend because "Wells Fargo's apparent inaction from September 2023 through April 2024," despite the purported default, was "curious."  (Doc. No. 31 at 10.)

In its Amended Answer, MM counterclaimed only for declaratory judgment as to whether Wells Fargo had "breached the maturity extension agreement" or "led [MM] to believe that the maturity date had been extended."  (Doc. No. 35 at 17-18.)  I again dismissed the Counterclaim because "MM raise[d] no new facts that support a contract or promise" to extend the Loan.  (Doc. No. 47 at 4.)  Wells Fargo now moves again for summary judgment, arguing it is owed $4,057,005.24 in total, and renews its Motion to Appoint a Receiver.  (Doc. No. 26, 61.)  The matter is fully briefed.  (Doc. Nos. 26, 30, 34, 45, 46, 61, 62.)

## III.   LEGAL STANDARDS

### A.    Summary Judgment

"[I]f there is no genuine issue as to any material fact [then] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant must show the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue

5

is material only if it could affect the result of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The district court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005). If the court then determines that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. See Celotex Corp., 477 U.S. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

        **B.**      **Mortgage Actions**

"The holder of a mortgage is entitled to summary judgment if the mortgagor admits that the mortgage is in default, the mortgagor has failed to pay on the obligation, and the recorded mortgage is in the specified amount." Bank of Am., N.A. v. Gibson, 102 A.3d 462, 464-65 (Pa. Super. Ct. 2014). "In an action regarding a note secured by a mortgage, the lender presents a prima facie case by showing the execution and delivery of the [note] and its nonpayment.'" Wells Fargo Bank, N.A. v. Chun Chin Yung, 317 F. Supp. 3d 879, 885 (E.D. Pa. 2018) (internal quotation marks omitted) (alteration in original) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1056 (Pa. Super. Ct. 1999)). "If the borrower does not dispute failing to make payments under the terms of the note, then the material facts are not in dispute." Id.

Summary judgment with respect to liability is appropriate when default is undisputed, even if the exact amount owed is disputed. Id. at 889.

        **C.**      **Receivership**

"A court may, in its discretion, appoint a receiver pendente lite." Leone Indus. v. Associated Packaging, Inc., 795 F. Supp. 117, 120 (D.N.J. 1992); Fed. R. Civ. P. 66. Appointment of a receiver is "appropriate only in the face of compelling circumstances and in the absence of a less drastic remedy." Leone Indus., 795 F. Supp. at 120. "[T]he party seeking receivership [must]

6

demonstrate[] 'the imminent danger of property being lost, injured, diminished in value or squandered, and where legal remedies are inadequate." Stonebridge Bank v. NITA Props., LLC, No. 09-cv-5145, 2011 U.S. Dist. LEXIS 59078, at *5 (D.N.J. June 1, 2011) (quoting id.). If a mortgagee seeks a receiver in the context of a mortgage foreclosure, courts consider whether:

> the property is inadequate security for the loan; the mortgage contract contains a clause granting the mortgagee the right to a receiver; the continued default of the mortgagor; the probability that foreclosure will be delayed in the future; the unstable financial status of the mortgagor; [and] the misuse of project funds by the mortgagor.

Wells Fargo Bank, N.A. v. CCC Atl., LLC, 905 F. Supp. 2d 604, 614 (D.N.J. 2012) (alteration in original) (quoting United States v. Berk & Berk, 767 F. Supp. 593, 597 (D.N.J. 1991)). "[T]hese factors may be applied in a less stringent manner if a loan agreement expressly allows for the lender to apply for a receiver in the event of a default." Wilmington Tr., Nat'l Ass'n v. 1800 16th St., LLC, No. 19-cv-2601, 2020 U.S. Dist. LEXIS 23860, at *5 (E.D. Pa. Feb. 11, 2020).

### IV. DISCUSSION

#### A. Summary Judgment

Wells Fargo argues it has made a prima facie case showing that there is no genuine dispute of material fact as to MM's mortgage default. (Doc. No. 61-7 at 7); Chun Chin Yung, 317 F. Supp. 3d at 885. I agree.

MM acknowledges it executed the Loan Agreement, Note, and Mortgage. (Doc. No. 1 ¶¶ 14-17; Doc. No. 35 ¶¶ 14-17.) The loan documents provided that the Loan Maturity Date was November 1, 2023, and "[a]ll remaining Indebtedness, including all principal and interest, will be due and payable by Borrower on the Maturity Date." (Doc. No. 61-5 Ex. B § 3(h), Ex. C at 2 of 22.) Failure to pay constitutes an Event of Default. (Doc. No. 61-4 Ex. A § 9.01(a); Doc. No. 61-5 Ex. C § 8.)

MM does not dispute that it failed to repay the Loan in full by the Maturity Date. (See

7

Doc. No. 62; Doc. No. 62-15.) Rather, it disputes that it was required to pay because of its pending extension requests to Berkadia and Midland. (Doc. 62 at 62-2 ¶ 8.) Because MM has not disputed that it failed to pay by the Maturity Date, Wells Fargo has met its prima facie burden. Chun Chin Yung, 317 F. Supp. 3d at 885.

MM argues that I should nonetheless deny summary judgment because the Bank acted in bad faith or had unclean hands by: (1) "intentionally delaying" and "failing to reasonably consider and/or investigate" MM's extension requests, and (2) interfering with MM's attempts to make payments. (Doc. No. 62 at 9-12.) MM also argues that Wells Fargo is not owed the full amount demanded. (Doc. No. 62 at 12-16.) I do not agree that Wells Fargo acted in bad faith, and it appears that the Bank is owed the amount it demands less the "Liquidation Fee."

### 1. Bad Faith and Unclean Hands

"Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." Donahue v. Fed. Express Corp., 753 A.2d 238, 242 (Pa. Super. Ct. 2000). "Good faith has been defined as 'honesty in fact in the conduct or transaction concerned.'" Id. Nevertheless, under Pennsylvania law, "[t]he duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract." Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank & Tr. Co., 560 A.2d 151, 154 (Pa. Super. Ct. 1989); Cable & Assocs. Ins. Agency v. Com. Nat'l Bank, 875 A.2d 361, 364 (Pa. Super. Ct. 2005); see also Heritage Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank, 801 A.2d 1248, 1253 (Pa. Super. Ct. 2002) ("[T]his Court has held that a lending institution does not violate a separate duty of good faith by adhering to its agreements with a borrower or enforcing its contractual rights as a creditor."). Separately, "[t]he unclean hands doctrine derives 'from the unwillingness of a court to give relief to a suitor [in equity] who has so conducted himself as to shock the moral sensibilities of the judge, and it has nothing to do with the rights or liabilities

of the parties.'" Vincent J. Fumo Irrevocable Children's Tr. for the Benefit of Allison Fumo, 104 A.3d 535, 546-47 (Pa. Super. Ct. 2014).

MM argues that Wells Fargo acted in bad faith by "stringing [it] along," then abruptly demanding payment and bringing this enforcement action. (Doc. No. 62 at 11.) Even if a duty of good faith exists in this context, Pennsylvania courts have held that implied duties cannot overcome express contract language. Stamerro v. Stamerro, 889 A.2d 1251, 1259 (Pa. Super. Ct. 2005) ("The duty of good faith and the doctrine of necessary implication apply only in limited circumstances. Implied duties cannot trump the express provisions in the contract." (quoting John B. Conomos, Inc. v. Sun Co., Inc., 831 A.2d 696, 705-6 (Pa. Super. Ct. 2003)); see also Miller Boys Props., LLC v. Conestoga Bank, 133 A.3d 80, 2015 WL 5937605, at *5 (Pa. Super. Ct. 2015) (unpublished) ("[I]t is beyond cavil that the implied duty [of good faith] can never trump the express language of the written contract."). Under the express terms of the Loan Agreement, Wells Fargo had "sole and absolute discretion" to grant or deny MM's extension requests. (Doc. No. 61-5 Ex. A § 11.09.)

In any event, MM has not made out that Wells Fargo acted in bad faith or that its conduct "shocks the moral sensibilities." Vincent J. Fumo Irrevocable Child.'s Tr., 104 A.3d at 546-47. "Generally, the covenant of good faith and fair dealing is an interpretive tool to determine the parties' justifiable expectations and do[es] not enforce an independent duty divorced from the specific clauses of the contract." Willis Re Inc. v. Hearn, 200 F. Supp. 3d 540, 551 (E.D. Pa. 2016) (internal quotation marks omitted) (alteration in original) (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 617 (3d Cir. 1995)). MM urges that Berkadia and Midland "in stringing [MM] along on the extension request" caused it to pass the Maturity Date leading to its "alleged default." (Doc. No. 62 at 11.) Yet, MM's "justifiable expectations" in requesting an extension only 45 days before a 7-year, multi-million-dollar loan matured necessarily included the

probability that its request would neither be granted, nor even processed, before the Maturity Date. (Doc. No. 62-5); Willis Re Inc., 200 F. Supp. 3d at 551.

Moreover, Wells Fargo made clear in its communications that negotiations were not binding. Donahue, 753 A.2d at 242 ("Good faith has been defined as 'honesty in fact in the conduct or transaction concerned.'") The November 1 letter from Berkadia disclaimed any "consent to your request," and did not "waive any of the rights and remedies of the Lender under any of the Loan documents." (Doc. No. 62-6 at 3.) The December 5 Pre-Negotiation Letter notified MM that the Loan was now being specially serviced by Midland, that either "Lender or Borrower" could terminate negotiations without reason or advance notice, and that no binding obligation on any Party related to the negotiations would be imposed without a "definitive written agreement." (Doc. No. 61-5 Ex. F.) MM executed both letters. (Doc. No. 62-6 at 4; Doc. No. 61-5 Ex. F.) In these circumstances, MM—a sophisticated real estate developer— was hardly "strung along." (Doc. No. 62-15 ¶ 8 ("I have been the lead developer in the Brewerytown neighborhood of Philadelphia since 2002 and indirectly own hundreds of units within blocks of the Property which MM Partners, LLC manages successfully.").) To the contrary, it could well expect that negotiations might abruptly end, making MM's full indebtedness due immediately. Willis Re Inc., 200 F. Supp. 3d at 551.

In sum, MM cannot make out that Wells Fargo acted in bad faith simply because it exercised its discretion under the Loan Agreement.

Similarly, MM has not produced any evidence that Berkadia, Midland, or Wells Fargo hampered payment attempts. The gravamen of MM's argument appears to be that it continued to believe Berkadia was the Loan's servicer. (Doc. No. 62 at 11-12.) Yet, the December 2023 Pre-Negotiation Letter informed MM that Midland was the Loan's special servicer, and subsequent communications were between MM and Midland. (Doc. No. 61-5 Ex. F; Doc. Nos. 62-12 to 62-

10

13, 62-16 to 62-17.) Moreover, in his April 16, 2024 letter, Defense Counsel stated that Berkadia had informed MM that it was not servicing the loan and that payment should be submitted directly to Midland. (Doc. No. 62-17.) Plainly, MM's apparent confusion does not make out bad faith. Willis Re Inc., 200 F. Supp. 3d at 551.

MM has not made out bad faith respecting Midland's other actions. MM has produced no evidence that Midland demanded payment between November 2023 and March 2024. (See Doc. Nos. 62-4 to 6-22.) When Midland did demand payment, it provided wiring instructions as MM requested. (Doc. No. 62-16.) MM provides no evidence that Midland then refused payment, or that MM attempted to pay it at all. (Doc. No. 62-13, 62-17.) In these circumstances, MM has not shown that Wells Fargo or its servicers engaged in any dishonesty "in [these] transaction[s]." (Doc. No. 61-5 Ex. A § 11.09); Willis Re Inc., 200 F. Supp. 3d at 551.

Accordingly, Wells Fargo is entitled to summary judgment as to liability.

### 2. Damages

Wells Fargo requests $4,057,005.24 in damages, representing the debt balance as of June 19, 2025. (Doc. No. 61-7 at 20-21.) This amount is itemized in the affidavit of Midland Asset Manager Brian Davis. (Doc. No. 61-4 ¶ 20.)

MM argues that Wells Fargo has not made out that it is owed the default interest of $221,500.86, legal fees of $209,781.41, or the $37,740.58 "Liquidation Fee." (Doc. No. 62 at 12-15; Doc. No. 61-5 ¶ 20.) Otherwise, MM does not challenge Wells Fargo's calculation of its indebtedness. (Doc. No. 62 at 12-15.) I agree with MM only as to the Liquidation Fee.

MM urges that the default interest was necessitated by Wells Fargo and its servicers' "dilatory and outright obstructive conduct" that induced MM to believe it was granted an extension and prevented it from making payments. (Id. at 13.) MM is recycling its bad faith arguments, which I have already rejected, and it does not dispute that the default interest is correctly calculated.

11

(See id. at 9-12.) Accordingly, Wells Fargo is entitled to summary judgment on these damages.

MM also argues that Wells Fargo's claimed legal fees are excessive. (Id. at 12.) Wells Fargo is contractually entitled to legal fees under the Loan Agreement, and it has exhaustively documented them here. (Doc. No. 61-6 Ex. A.; see also Doc. No. 61-4 Ex. A § 9.03 ("Upon an Event of Default, Lender may exercise any or all of its rights and remedies . . . and Borrower will pay all costs associated therewith, including Attorney's Fees and Costs.").) MM does not dispute the reasonableness of the rates or time charged. (Doc. No. 62 at 13-14.) Rather, it argues again that fees from January to May 2024 would not have been incurred absent Wells Fargo's bad faith. (See id. at 14.) Because Wells Fargo did not act in bad faith and MM raises no other objection to these fees, the Bank is entitled to summary judgment on these damages as well.

Finally, MM urges that no Liquidation Fee is owed under the Loan Agreement. (Id. at 14.) In support, MM includes an email exchange between Schueller and Garber where Schueller explains the Liquidation Fee as follows: (1) the Loan was placed in a securitized trust under § 11.13 of the Loan Agreement; (2) MM agreed to the general indemnity provision § 10.02 to cover trust expenses; (3) because the Loan was in default, it went to special servicing under the trust; (4) the liquidation fee is compensation to the special servicer as part of a "Pooling and Servicing Agreement." (Doc. No. 62-22.)

Schueller states that he is attaching the "Pooling and Servicing Agreement" to the email to Garber. (Id.) Neither Wells Fargo nor MM provided this agreement to the Court, however, and Wells Fargo does not explain the Liquidation Fee in its brief or accompanying exhibits. (See Doc. Nos. 61 to 61-7, Docket.) Davis testified that the Liquidation Fee is charged when the loan is liquidated and that it would be due at the time of payoff, but otherwise could not identify a Loan Agreement provision that entitled Wells Fargo to this Fee or the specific amount charged. (Doc. No. 62-4 70:21-73:4.) Because Wells Fargo's entitlement to this Fee is thus unclear, I will deny

12

its request for summary judgment without prejudice.  Chun Chin Yung, 317 F. Supp. 3d at 885.

**B.     Receivership**

Wells Fargo argues that it has a contractual right to seek receivership following default, and the Property is at risk of "waste, injury, dissipation of property or abuse of funds."  (Doc. No. 26-10 at 12; Doc. No. 61-5 Ex. C § 3(c)(ii).)  I do not agree.

In support, the Bank provides January 29, 2025 photographs of a first-floor commercial space and basement both occupied with disorganized belongings, as well as an alleyway filled with trash.  (Doc. No. 45 at 9-13.)  It also notes that MM's revenue decreased 39% from 2023 to 2024 while its expenses doubled, "suggesting that Defendant is diverting rent" and "may be paying expenses which are really attributable to Defendant's owners or affiliates."  (Id. at 3-4.)

MM argues that the first-floor tenant was evicted and was in the process of clearing out its belongings, the basement is a storage area, and the alleyway photographs were taken on a Wednesday before the trash was picked up on Friday.  (Doc. No. 46 at 2-3.)  It also argues that the decrease in revenue is due to market conditions, and the increase in expenses is due to deferred building maintenance and previous tenants having triple net leases.  (Id. at 4.)

Wells Fargo has not made out that "the property is inadequate security for the loan."  CCC Atl., LLC, 905 F. Supp. 2d at 614.  The Bank has not provided an appraisal of the Property, nor has it shown that any of the photographic conditions are more than temporary.  There is no evidence that the building itself is poorly maintained, and Wells Fargo even averred that in January 2025 that the space was "nearly fully occupied" with tenants.  (Doc. No. 45 at 4.)  Moreover, although it initially averred that MM was not providing it with rent rolls as required, its Supplement indicates that it has since received them.  (See Doc. Nos. 26-10 at 13, 45 at 4.)  Finally, there is no evidence that foreclosure will be delayed, given that I am granting Wells Fargo summary judgment at this time.  See Wells Fargo Bank, N.A. v. 840 Westchester Ave. NMA, LLC, No. 24-cv-07680,

2025 U.S. Dist. LEXIS 97257, at *29 (S.D.N.Y. May 21, 2025) ("Since the Court has granted the primary relief of foreclosure on the mortgaged Property, [the plaintiff] has not shown the appointment of a receiver is 'clearly necessary' to protect its interests in the property.").

Accordingly, I will deny its Motion to Appoint a Receiver without prejudice. Wells Fargo may renew its Motion if foreclosure proves inadequate to protect its interests.

V.      **CONCLUSION**

In sum, Wells Fargo has shown that no genuine dispute of material fact exists as to whether MM has defaulted on its mortgage. Moreover, Wells Fargo has made out that it is entitled summary judgment on the damages it seeks, absent the Liquidation Fee. Finally, I will deny Wells Fargo's Motion to Appoint a Receiver without prejudice because I am granting summary judgment on foreclosure at this time, but Wells Fargo may renew if this relief proves inadequate.

An appropriate Order follows.

**AND IT IS SO ORDERED:**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.